IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PRISCILLA A. CUNNINGHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-765-PJC |
| ) | |
| CAROLYN W. COLVIN, Acting Commissioner ) | |
| of the Social Security Administration[1], ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Priscilla A. Cunningham ("Cunningham"), pursuant to U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will go directly to the Tenth Circuit Court of Appeals. Cunningham appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she was not disabled. For the reasons discussed below, the Court **REVERSES** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Cunningham was 36 years old when she testified before the ALJ on February 18, 2010. (R. 30). She had a high school education. *Id.* At the time of Cunningham's asserted onset of disability, she operated a home daycare business. (R. 27, 31-32). Cunningham testified that she was unable to work due to low back pain. (R. 26).

Cunningham testified that she sustained a ureteral injury and a lacerated bladder during a laparoscopic hysterectomy surgery. (R. 31). As a result of the surgical complications, she suffered bowel problems, incontinence, bladder infections, and pain associated with bladder spasms. (R. 34-36). She said that five days a week she suffered several hours of stomach pain. (R. 34-35). She tried to return to work at home shortly after her surgery, but she was unable to bend over and was unable to lift the babies. (R. 27, 32). At that same time, she started to have problems with depression and anxiety. (R. 32). Because of her limitations, she had to quit her daycare business. *Id.* She started a job in customer service working from her home. *Id.* The job allowed Cunningham a flexible schedule, and it allowed her to be able to move around freely, including working while sitting up or lying down. (R. 33-34). She testified that she had to quit the job because it was "just too hard to deal with" work, pain, depression, and anxiety. (R. 34).

Cunningham said that she suffered nerve pain in her back that radiated down her leg. (R. 27). Her pain interfered with her ability to walk, bend, lift, and sit for prolonged periods. *Id.* She had received steroid injections to treat her pain that caused her to gain approximately 30 to 40 pounds over a three to five month period. (R. 30). On the date of the hearing, Cunningham was 5'4" and weighed 250 pounds. *Id.*

Cunningham testified that shortly after her hysterectomy, she started on medications to treat depression and anxiety. (R. 27-28). She testified that the side effects from the psychotropic medications, hydrocodone, a muscle relaxer, and a sleep aid made her feel dizzy and drowsy, and made it difficult for her to sleep. (R. 27-29, 36). She said that though she had been prescribed a sleeping pill, she seldom took it because it made her feel "loopy" and "weird." (R. 36).

In Cunningham's testimony regarding her activities of daily living, she said that her pain never went away and that she had just learned to deal with it after ten years. (R. 36). She said that she could sit for a couple of hours through the administrative hearing by frequently repositioning herself, but afterwards she would have to take medication and lie down. (R. 36). Sitting through her church's two hour service caused her to suffer pain in her back and her tailbone. (R. 37). Depending on the duration of how long she sat, it would take her a few day to "recuperate". (R. 36-37). She testified that she did nothing during the day and that she spent 23 hours a day in bed. *Id*. Her bladder problems caused the need to urinate every one to two hours, so she limited the amount of water she drank. (R. 35-36). Cunningham did not cook for herself, but she was able to feed herself. (R. 37-38). She said she was able to lift her purse, but could not lift a gallon of milk. (R. 38). She drove once every couple of weeks. (R. 39). She read out loud to her son, but she had difficulty understanding what she had said, so she re-read it three or four times. (R. 30-31).

On October 18, 2006, Marsha A. Nahra, M.D., diagnosed Cunningham with uterine prolapse and sacril pain. (R. 324-25). Results of an ultrasound on December 14, 2006 confirmed Dr. Nahra's diagnoses, and the ultrasound also revealed that Cunningham had a small right ovarian follicular cyst. (R. 330). On December 20, 2006, Cunningham sustained a bladder injury during a hysterectomy procedure. (R. 203-30). During the course of her hospital stay, she

3

had complaints of bladder spasms, slow bowel function, and pain. (R. 228).

Following Cunningham's hospital discharge on December 24, 2006, she saw Thomas Rickner, M.D., on December 28, 2006 for ongoing problems with bladder spasms, and for bilateral sciatic pain and incontinence. (R. 208-09, 228-29, 232-38, 304, 308-12). She reported that her bladder felt heavy and as though it were falling out. (R. 310, 312). She was treated with medication for her pain. (R. 235). She had complaints of depression, crying spells, and difficulty sleeping. (R. 312).

Dr. Rickner's notes from Cunningham's February 15, 2007 appointment state that Cunningham was doing well and that she did not have any flank pain. (R. 232). He reviewed the results from her January 26, 2007 kidney x-rays and wrote that she had "mild hydronephrosis[2] on the left with normal ureters, [and] a left-sided periureteral bladder diverticulum." (R. 232, 254). Dr. Rickner's impression was status post ureteral injury with mild hydronephrosis. *Id*.

On February 26, 2007, Cunningham phoned Dr. Rickner and reported that she had pain in her left side. (R. 232). She phoned back the following day and said that she gone to urgent care for her pain and was treated for a urinary tract infection. *Id*.

Cunningham was seen at Laureate Psychiatric Clinic & Hospital ("Laureate") on June 23 and 26, 2008, for complaints of irritability, self-isolation, anhedonia, anxiety, and insomnia. (R. 240-41, 249). Cunningham reported that for as long as she could remember she had experienced yearly episodes of depression that lasted for weeks to a month at a time. (R. 240). She said that

---

[2]Hydronephrosis is a "[c]ollection of urine in the renal pelvis due to obstructed outflow, forming a cyst by production of distention and atrophy of organ." Taber's Cyclopedic Medical Dictionary 925 (17th ed. 1993).

her episodes were intense and lasted for longer periods. *Id*. Axis I[3] diagnoses were major depressive disorder, recurrent, moderate, and generalized anxiety disorder. (R. 241, 249). Her Global Assessment of Functioning ("GAF")[4] was 60. *Id*. She was given a prescription for Cymbalta and Ambien. *Id*. When she was seen on July 8, 2008, she had ongoing complaints of persistent anxiety, irritability, self-isolation, and low motivation. (R. 242). Cunningham said that her sleep had improved with medication, but that her mood had not improved. *Id*. The doctor added the medication clonazepam to treat Cunningham's anxiety. *Id*. On July 25, 2008, Cunningham reported that she had increased symptoms of anxiety, along with mood swings and a decreased appetite. (R. 245). She reported that even with Ambien, it took her hours to fall asleep. *Id*. She said that she felt helpless and hopeless. *Id*. Cunningham reported having a prior problem with gambling and that she had started gambling again. *Id*. The doctor increased the dosage of her medications and started her on the medication Seroquel. *Id*. When Cunningham was seen on July 30, 2008, she reported no improvement in her mood, but her symptoms of anxiety had decreased. (R. 244). When Cunningham's doctor suggested that she attend therapy for a gambling addiction, she responded that she was not ready at that point to quit. *Id*. The

---

[3] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[4] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

doctor included pathological gambling to Cunningham's prior diagnoses, and assessed her GAF as 65. *Id.* During her appointments from August 2008 through December 2008, Cunningham continued to complain of increased symptoms of depression, anxiety, crying spells, fatigue, low motivation, and isolating issues. (R. 340-44). The doctor adjusted her medications several times during those months. *Id.*

On September 22, 2008, Jayen H. Patel, M.D., examined Cunningham for lumbar back pain and right-sided sciatic nerve pain. (R. 337-39). Cunningham told Dr. Patel that she had constant low back pain that was sharp, throbbing, and aching. (R. 337). She also complained of having shooting pain in her leg, with subjective weakness. *Id*. Her pain increased with sitting, standing, walking, and lifting. *Id*. Muscle relaxers, pain medications, and lying down helped to alleviate her pain. *Id*. She reported having gained significant weight and having insomnia. (R. 338). Dr. Patel reviewed of an MRI scan of Cunningham's low back and wrote that she had "sacralization of the L5 and S1 vertebra with complete desiccation and erosion of the L5 disk, and degenerative disk disease and facet arthropathy." (R. 337-38). Dr. Patel's impressions were lumbar degenerative disk disease, obesity, and high-risk medications/narcotics contact.[5] (R. 339). He recommended that Cunningham undergo a bilateral L5 transforaminal nerve root block injection. *Id*. He started her on a low dose of methadone and gave her a prescription for morphine sulfate for breakthrough pain. *Id*.

On September 30, 2008, Dr. Patel performed an epidural steroid injection. (R. 261-62, 333-36). Cunningham had continued problems with lower extremity sciatica pain, so she elected to have a second epidural steroid injection procedure by Dr. Patel on January 12, 2009. (R. 331-

---

[5] Cunningham's medical records reflect that she had a past history of substance abuse, but Cunningham did not complain of any limitations related to this in her disability claim.

6

32).  On April 7, 2009, Cunningham phoned Dr. Patel and reported that she was frequently in more pain and that she felt her medications were no longer working effectively.  (R. 352-53). She was treated with an increased dosage of methadone.  (R. 352).

Cunningham presented to Laureate on January 19, 2009, for complaints of low energy and fatigue.  (R. 340).  Cunningham's husband told the doctor that Cunningham had a long history of isolating herself in her room.  *Id*.  The doctor gave Cunningham refills of her prescriptions, but told her that Dr. Patel would have to manage her psychotropic medications in the future.  *Id*.

On June 10, 2009, Cunningham presented to the emergency room at SouthCrest Hospital for abdominal pain.  (R. 356-61).  The results from her abdominal CT scans were normal.  (R. 358).

Agency consultant Seth Nodine, D.O., examined Cunningham on November 18, 2008, and her chief complaints were back and sciatica pain.  (R. 264-70).  Cunningham told Dr. Nodine that she had an approximate ten year history of back pain, and that she had pain in her left buttock and hip that radiated into her left leg.  (R. 264).  She said that she had episodes when she had difficulty being able to stand or walk without help.  *Id*.  She told Dr. Nodine that she had intermittent pain that was made worse with minimal exertion or even showering.  *Id*.  Dr. Nodine noted that Cunningham denied abdominal pain, any increased urinary frequency, or loss of bladder or bowel control, but that she reported she had accidents because it took her so long to get to the bathroom.  (R. 264-65).  On examination, Dr. Nodine said that Cunningham could move about the examination room easily, but she had reduced and painful range of motion of the spine.  (R. 266).  Dr. Nodine filled out a range of joint motion evaluation chart that showed reduced range of motion in her back.  (R. 267, 270).  On the form, Dr. Nodine noted those

7

movements caused Cunningham to have pain and tenderness. (R. 270). Dr. Nodine's assessments included lumbar back pain with radiculopathy - status post L5 fusion with multiple level repair by history on chronic pain medication, obesity, GERD, anxiety, and major depressive disorder. (R. 266).

Agency consultant Denise LaGrand, Psy.D., conducted a mental status examination of Cunningham on November 24, 2008. (R. 271-77). During the examination, Cunningham told Dr. LaGrand that she applied for disability benefits due to her depression. (R. 271). She said that most of the time her mood was depressed. (R. 274). She reported that she had a low energy level, had gained weight, had lost interest in her previously enjoyed activities, and had difficulty sleeping. (R. 274-75). She said that she often did not want to get out of bed and that she rarely left her home. (R. 271). She reported that she had some memory problems and that she would ask the same question repeatedly. *Id*. Dr. LaGrand noted that Cunningham described symptoms of anxiety that included nervousness, shaking, increased heart rate, and heavy breathing. *Id*. Cunningham told her that she had the symptoms for a long time, but that they had increased after her hysterectomy. *Id.* Cunningham reported that she had pain when dressing, bathing, cooking, and doing household chores. (R. 275). In Cunningham's report of her typical day, she said that she watched television while lying down, went to sleep after taking her medication, and spent time with her family. (R. 275).

Dr. LaGrand noted that Cunningham's pain was "indicated by her frequent repositioning, difficulty getting up, stiffness after sitting and her facial expressions." (R. 273). Dr. LaGrand observed Cunningham's affect to be appropriate and consistent with depression being her current and her typical mood. (R. 274). She found that Cunningham's IQ was in the average range. (R. 275). Dr. LaGrand wrote that Cunningham had "impairment in social relationships." (R. 273-

74). Dr. LaGrand's Axis I diagnoses were pain disorder due to a general medical condition; major depressive disorder, moderate; and generalized anxiety disorder. (R. 275). Her GAF was 55. *Id*. In Dr. LaGrand's assessment of Cunningham's impairments, she wrote "that the combination of [Cunningham's] mental and physical problems should be taken into account when determining her eligibility for disability benefits, because their combination made it less likely that Cunningham would be successful in a job setting." *Id*. She added that Cunningham's "[a]bility to perform adequately in most job situations, handle the stress of a work setting and deal with supervisors or co-workers is estimated to be low average but may be lower due to pain." *Id*. Dr. LaGrand wrote in her prognosis that Cunningham's condition was not likely to improve significantly in the next twelve months. (R. 276).

Agency nonexamining consultant Kathleen Gerrity, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on December 17, 2008. (R. 278-94). For Listing 12.04, Dr. Gerrity noted Cunningham's mood disturbance with depressive syndrome and major depressive disorder, recurrent, moderate. (R. 282, 285). For Listing 12.06, Dr. Gerrity noted Cunningham's anxiety. (R. 287). For Listing 12.09, Dr. Gerrity noted Cunningham's history of polysubstance abuse, noting that she had reported ten years of remission. (R. 290). For the "Paragraph B Criteria,"[6] Dr. Gerrity found that Cunningham had marked restriction of activities of daily living, moderate difficulties in

---

[6] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

9

maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 292). In the "Consultant's Notes" portion of the form, Dr. Gerrity noted Cunningham's treating history for depression and anxiety. (R. 294). Dr. Gerrity briefly summarized the report of Dr. LaGrand. *Id*. Dr. Gerrity wrote that Cunningham's symptoms affected her daily functioning, but not at the listing level. *Id*.

In Dr. Gerrity's Mental Residual Functional Capacity Assessment, she found that Cunningham was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 278). Dr. Gerrity also found Cunningham to be moderately limited in her ability to interact appropriately with the general public. (R. 279). She found no other significant limitations. (R. 278-79). Dr. Gerrity found that Cunningham: (1) could perform simple tasks as indicated by her ability to drive, shop, and manage money and bills; (2) could relate to others in a superficial manner as indicated by her statement that she did not have any problems getting along with others; and (3) could adapt to a work situation. (R. 280).

Non-examining agency consultant Kenneth Wainner, M.D., completed a Physical Residual Functional Capacity Assessment on December 22, 2008. (R. 295-302). Dr. Wainner determined that Cunningham had the exertional capacity to perform the full range of light work. (R. 296). For narrative explanation, Dr. Wainner summarized the conclusions reached by Dr. Nodine in his examination. *Id*. Dr. Wainner found no postural, manipulative, visual, communicative, or environmental limitations. (R. 296-301).

## Procedural History

On August 12, 2008, Cunningham filed applications for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 124-33). The applications were denied initially and on reconsideration. (R. 49-

57, 62-67). A hearing before ALJ John Volz was held on February 18, 2010. (R. 23-43). By decision dated March 9, 2010, the ALJ found that Cunningham was not disabled. (R. 15-22). On October 13, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[7] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If

---

[7] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Cunningham met insured status requirements through the date of the decision. (R. 17). At Step One, the ALJ found that Cunningham had not engaged in substantial gainful activity since her alleged onset date of December 19, 2006. *Id.* At Step Two, the ALJ found that Cunningham had severe impairments of obesity and status post lumbar fusion with multiple level repair. *Id.* At Step Three, the ALJ found that Cunningham's impairments did not meet a Listing. (R. 19).

The ALJ determined that Cunningham had the RFC to perform a full range of light work. *Id.* At Step Four, the ALJ found Cunningham was capable of performing past relevant work. (R. 20). As an alternative finding, at Step Five, the ALJ found that there were jobs in significant numbers

in the national economy that Cunningham could perform, considering her age, education, work experience, and RFC. *Id.* Thus, the ALJ found that Cunningham was not disabled from December 19, 2006 through the date of the decision. (R. 22).

## Review

Cunningham asserts multiple errors on the part of the ALJ. The Court finds that the ALJ erred by ignoring the reports of Dr. Gerrity and therefore this case must be reversed and remanded for further consideration.

It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). A bare conclusion, without discussion, is beyond meaningful judicial review, and therefore an ALJ is required to discuss the evidence and give reasons for his conclusions. *Clifton*, 79 F.3d at 1009.

Generally, the evidence of a nonexamining consultant, such as Dr. Gerrity, is given less weight than evidence from other sources. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). However, even nonexamining consultant opinion evidence must be weighed and explained when the opinions are conflicting. *Shubargo v. Barnhart,* 161 Fed. Appx. 748, 753-54 (10th Cir. 2005) (unpublished). In *Shubargo*, there were several nonexamining opinions, and most of them said that the claimant could do light work, but one opinion said that the claimant could only do sedentary work. *Id.* In his RFC determination, the ALJ found that the claimant could do light work,

but he did not explain why he rejected the nonexamining opinion that the claimant could only do sedentary work in favor of the other opinions. The Tenth Circuit found that the case had to be remanded to allow the ALJ to make this explanation. *Id. See also Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (ALJ's rejection of consulting examiner's opinion evidence by including some restrictions and excluding others required explanation); *Kerwin v. Astrue*, 244 Fed. Appx. 880, 884-85 (10th Cir. 2007) (unpublished) (ALJ's unexplained failure to include handling, fingering, and walking limitations found in consulting examiner's opinion required reversal).

Here, at Step Two, the ALJ found that two physical impairments were severe. (R. 17). In his discussion after that finding, he said that Cunningham's medically determinable mental impairments of depression and anxiety were nonsevere. (R. 18). He considered the Paragraph B Criteria, and he cited to Dr. LaGrand's consulting examination report. *Id.* Then, he said that Dr. Gerrity had found "no significant limitation in [Cunningham's] ability to maintain attention and concentration for extended periods." *Id.*

It is obvious error for the ALJ to use Dr. Gerrity's report in one instance to support his finding that Cunningham's mental impairments were nonsevere while not mentioning those portions of the report that supported Cunningham's claims. *See Robinson*, 366 F.3d at 1083 (An ALJ is "not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability"); *Chapo v. Astrue*, 682 F.3d 1285, 1291-92 (10th Cir. 2012) (error for ALJ to accept one part of physician's opinion with no explanation for why remainder was not creditable). Dr. Gerrity found that Cunningham's mental impairments were severe, and the ALJ never discussed that finding or why he decided not to follow Dr. Gerrity's expert opinion on that point. Dr. Gerrity found that Cunningham had a moderate limitation in her ability to understand, remember, and carry out detailed instructions. (R. 278). Dr. Gerrity

14

also found Cunningham to be moderately limited in her ability to interact appropriately with the general public. (R. 279). The ALJ did not discuss these findings, and he did not include these limitations in his RFC determination. (R. 19). Pursuant to the Tenth Circuit authorities discussed above, failure to discuss Dr. Gerrity's findings and failure to explain why his RFC determination did not include all of the limitations found by Dr. Gerrity were reversible errors.

Because the error of the ALJ related to the opinion evidence requires reversal, the undersigned does not address the other contentions raised by Cunningham. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Cunningham.

This Court takes no position on the merits of Cunningham's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 5th day of April, 2013.

_____
Paul J. Cleary
United States Magistrate Judge